## STATE v. EIDSVOLD CREAMERY COMPANY.[1]

June 1, 1923.

No. 23,417.

**Question of variance in name not to be raised first on appeal.**
1. A variance in the name of the person to whom defendant was charged with selling adulterated butter cannot be taken advantage of in this court, unless raised in the court below.

**Identity of adulterated butter proven.**
2. The identity of the butter proven to have contained lard with that sold, was sufficiently established.

[1]Reported in 194 N. W. 17.

### Analysis of state chemist adequate proof.

3. The court was justified in finding the analysis of the state's chemist adequate proof of the presence of lard in the butter, and also that the lard reduced the quality and strength of the butter.

### Hypothetical question may be put to expert.

4. A hypothetical question, the answer of which tends to refute or weaken the testimony of an expert witness, may be asked him on cross-examination.

### Attempted defense not proven.

5. The trial court was justified in concluding that the defense attempted failed.

### Rulings of court sustained.

6. No reversible error is found in the rulings of the court.

Defendant was charged in the municipal court of Minneapolis with selling adulterated butter, tried before Salmon, J., and found guilty and fined $75. From an order denying its motion for amended findings or for a new trial, defendant appealed. Affirmed.

*Sam J. Levy,* for appellant.

*Clifford L. Hilton,* Attorney General, *Neil M. Cronin,* City Attorney, and *Thomas B. Kilbride,* Assistant City Attorney, for respondent.

HOLT, J.

The defendant, a corporation engaged in manufacturing butter in the city of Minneapolis, was charged with a violation of the pure food law, chapter 495, p. 841, Laws of 1921, in having sold a pound of butter adulterated with lard, thereby injuriously affecting the quality and strength of the butter. It was convicted and appeals from the order denying a new trial.

The evidence showed that the pound of butter was sold to C. J. Crooker. The complaint alleged a sale to C. J. Crooks. This is said to be a fatal variance. We think the point is made too late. It was never suggested or presented to the court below. The grava-

men of the offense was the sale of the adulterated butter, the name of the purchaser was a mere incident to identify the sale.

It appears to us that the butter analyzed by the state chemist was adequately proven to have been sold by defendant to C. J. Crooker, about the time alleged in the complaint. No good purpose would be served by setting out the evidence in that respect. Defendant's president, when on the witness stand, admitted that there was no question but that the butter in the package analyzed was the product of defendant. The package or carton containing this butter was properly received in evidence.

There is really no evidence disputing that of Dr. Hortvet, the state's expert chemist, that lard was found in this pound of butter sold by defendant. Defendant's chemist concedes the crystals, developed and photographed by Dr. Hortvet in the analysis, to be those of lard. True, there was no quantitative analysis; however, the statute is not directed against quantity or degree of adulteration, but against all adulteration that lessens the quality or strength of an article of food. That the addition of lard, in any quantity, to butter reduces or injuriously affects its quality or strength is a matter of common knowledge, and if proof were necessary defendant's president furnished it. The testimony of the state chemist discloses quite satisfactorily that a careful analysis was made by him and recognized tests applied to determine the presence of lard, and that lard was found. The state is not bound to conform to the standard of purity which Federal agencies may set for butter or any other food product sold in this state.

We see no impropriety in the hypothetical question put to defendant's chemist which elicited the answer showing that taking a certain quantity of pure butter, within the limits of the Federal standard, some 14 per cent of lard might be added and still it would pass the test the chemist had applied to one of the samples he analyzed for defendant without disclosing the lard.

The real defense attempted seems to have been this: Defendant, becoming aware of the fact that the authorities were suspicious of the purity of the butter produced and sold by it, took samples of the run of butter every day and placed such samples in cold storage

against the day of prosecution. In preparation for this trial, it employed the chemist referred to who analyzed three samples taken from the cold storage stock and found each sustained the Federal test for pure butter, one low, but two quite high. But, as already intimated, he admitted this test did not prove that there might not have been a considerable percentage of lard present in the samples analyzed.

The trial was to the court, without a jury, and it is not believable that the state was aided or defendant harmed by the insinuations needlessly injected by the prosecuting attorney into certain questions put to defendant's president when cross-examined. There certainly was no error in refusing to permit defendant's expert to read, as evidence, extracts from scientific works on the proper tests for pure butter. Moehlenbrock v. Parke, Davis & Co. 141 Minn. 154, 169 N. W. 541.

The order is affirmed.